# EXHIBIT 2

**Execution Version**

# PARTIAL STRICT FORECLOSURE AGREEMENT

among

KRANOS CORPORATION
AND CERTAIN AFFILIATES,

as Borrowers;

MAN IN THE ARENA, INC.,
KRANOS HOLDING CORPORATION,
KRANOS INTERMEDIATE HOLDING CORPORATION,
and KRANOS ACQUISITION CORPORATION,

as Guarantors;

ROBERT W. ERB, JR. and JAMES A. STUTTS, JR.,

as Pledgors;

and

SCHUTT ACQUISITIONCO, LLC,
as Lender and Agent

effective as of
December 4, 2020

{9187428:12 }

## Table of Contents

**Page**

**ARTICLE 1**
DEFINITIONS AND CONSTRUCTION

| | | |
|---|---|---|
| **1.1** | Definitions | 3 |
| **1.2** | References to Documents | 7 |
| **1.3** | References to Laws | 8 |
| **1.4** | References to this Agreement | 8 |
| **1.5** | Other Interpretive Conventions | 8 |

**ARTICLE 2**
PARTIAL STRICT FORECLOSURE AND CONSENTS

| | | |
|---|---|---|
| **2.1** | Nature of and Consents to Transactions | 8 |
| **2.2** | Additional Conveyances | 9 |
| **2.3** | Further Waivers | 9 |

**ARTICLE 3**
TRANSFER AND ACCEPTANCE

| | | |
|---|---|---|
| **3.1** | Transfer and Acceptance of Assets | 9 |
| **3.2** | Excluded Assets | 11 |
| **3.3** | Title to Assets; No Assumption of Liabilities | 11 |
| **3.4** | Consideration | 11 |
| **3.5** | Certain Third-Party Consents | 12 |
| **3.6** | Closing | 12 |
| **3.7** | Closing Deliverables | 12 |
| **3.8** | Lender Designees | 15 |

**ARTICLE 4**
REPRESENTATIONS AND WARRANTIES OF DEBTORS

| | | |
|---|---|---|
| **4.1** | Organization and Qualification of Debtors | 16 |
| **4.2** | Authority of Debtors | 16 |
| **4.3** | No Conflicts; Consents | 16 |
| **4.4** | Financial Statements | 17 |
| **4.5** | Undisclosed Liabilities | 17 |
| **4.6** | Material Contracts | 17 |
| **4.7** | Title to Assets | 19 |

**4.8**   Sufficiency of Assets ................................................................................. 19

**4.9**   Legal Proceedings; Governmental Orders .................................................. 19

**4.10**  Real Property ............................................................................................ 19

**4.11**  Intellectual Property................................................................................. 20

**4.12**  Accounts Receivable................................................................................. 20

**4.13**  Customers ................................................................................................ 21

**4.14**  Employee Benefit Matters ....................................................................... 21

**4.15**  Employment Matters................................................................................ 21

**4.16**  Taxes ....................................................................................................... 22

**4.17**  Environmental Matters............................................................................. 22

**4.18**  Inventory ................................................................................................. 24

**4.19**  PPP Loan.................................................................................................. 24

**4.20**  Brokers .................................................................................................... 24

### ARTICLE 5
REPRESENTATIONS AND WARRANTIES OF GUARANTORS

**5.1**   Organization and Qualification of Guarantors........................................... 24

**5.2**   Authority of Guarantor ............................................................................ 24

**5.3**   No Conflicts; Consents ............................................................................ 25

**5.4**   Brokers .................................................................................................... 25

### ARTICLE 6
REPRESENTATIONS AND WARRANTIES OF PLEDGORS

**6.1**   No Conflicts; Consents ............................................................................ 26

**6.2**   Brokers .................................................................................................... 26

### ARTICLE 7
REPRESENTATIONS AND WARRANTIES OF LENDER

**7.1**   Organization and Authority of Lender; Enforceability................................ 26

**7.2**   No Conflicts; Consents ............................................................................ 26

**7.3**   Legal Proceedings .................................................................................... 27

**7.4**   Brokers .................................................................................................... 27

### ARTICLE 8
COVENANTS

**8.1**   Employees................................................................................................ 27

**8.2**   Public Announcements ............................................................................. 27

**8.3**   Transfer Taxes ......................................................................................... 27

**8.4**   Confidentiality ......................................................................................... 27

| | | |
|---|---|---|
| **8.5** | Bulk Sales Laws | 27 |
| **8.6** | Receivables | 28 |
| **8.7** | Further Assurances | 28 |

**ARTICLE 9**
OTHER AGREEMENTS

| | | |
|---|---|---|
| **9.1** | Tax Refunds and Workers Compensation Bond | 28 |
| **9.2** | Release of Lender Parties | 28 |
| **9.3** | Release of Debtor Parties and Pledgors | 29 |

**ARTICLE 10**
MISCELLANEOUS

| | | |
|---|---|---|
| **10.1** | Survival | 29 |
| **10.2** | Expenses | 29 |
| **10.3** | Notices | 29 |
| **10.4** | Headings | 31 |
| **10.5** | Severability | 31 |
| **10.6** | Entire Agreement | 31 |
| **10.7** | Successors and Assigns | 32 |
| **10.8** | No Third-Party Beneficiaries | 32 |
| **10.9** | Amendment and Modification | 32 |
| **10.10** | Waiver | 32 |
| **10.11** | Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver | 32 |
| **10.12** | Specific Performance | 32 |
| **10.13** | Counterparts | 32 |

**Disclosure Schedules**

| Schedule | Scope |
|----------|-------|
| 3.1(i) | Gross Cash, Retained Cash, and Assumed Transition Liabilities |
| 3.1(ii) | Accounts Receivable |
| 3.1(iii) | Inventory |
| 3.1(v) | Intellectual Property |
| 3.1(vi) | FF&E |
| 3.1(vii) | Owned Real Property |
| 3.1(viii) | Permits |
| 3.1(ix) | Prepaid Expenses |
| 3.2(iv) | Excluded Assets |
| 3.3 | Trade Payables |
| 3.4(b) | [Reserved] |
| 4.1 | Jurisdictions in which Debtors are Qualified |
| 4.3 | Required Consents and Notices |
| 4.6 | Material Contracts; Material Disputes |
| 4.9(a) | Actions |
| 4.9(b) | Orders |
| 4.11(b) | IP Agreements |
| 4.13 | Top 10 Customers |
| 4.14(a) | Employee Benefit Matters |
| 4.15(a) | Employees and Contractors |
| 4.15(b) | Union Relationships |
| 4.15(c) | Employment Law Compliance |
| 4.16 | Tax Matters |
| 4.17 | Environmental Matters |
| 5.1 | Jurisdictions in which Guarantors are Qualified |
| 5.3 | Conflicts; Consents (Guarantors) |
| 6.1 | Conflicts; Consents (Pledgors) |

## PARTIAL STRICT FORECLOSURE AGREEMENT

This Partial Strict Foreclosure Agreement (this "**Agreement**") is effective as of December 4, 2020, by and among: (i) KRANOS CORPORATION, a Delaware corporation ("**Kranos Corporation**"), KRANOS RE CORPORATION, a Delaware corporation ("**Kranos RE**"), KRANOS IP CORPORATION, a Delaware corporation ("**Kranos IP**"), KRANOS IP II CORPORATION, a Delaware corporation ("**Kranos IP II**"), KRANOS IP III CORPORATION, a Delaware corporation ("**Kranos IP III**"), KRANOS DIAMOND SPORTS, INC., a Delaware corporation ("**Kranos Diamond**"), FIELD TO FIELD, INC., a Delaware corporation (together with Kranos Corporation, Kranos RE, Kranos IP, Kranos IP II, Kranos IP III and Kranos Diamond, collectively, "**Borrowers**" and each individually, a "**Borrower**"); (ii) MAN IN THE ARENA, INC., a Delaware corporation ("**Man in the Arena**"), KRANOS HOLDING CORPORATION, a Delaware corporation ("**Kranos Holding**"), KRANOS INTERMEDIATE HOLDING CORPORATION, a Delaware corporation ("**Kranos Intermediate**"), KRANOS ACQUISITION CORPORATION, a Delaware corporation (together with Man in the Arena, Kranos Holdings, and Kranos Intermediate, collectively, the "**Guarantors**" and each individually, a "**Guarantor**"); (iii) ROBERT W. ERB, JR. and JAMES A. STUTTS, JR. (collectively, the "**Pledgors**"); and (iv) SCHUTT ACQUISITIONCO, LLC, a Delaware limited liability company ("**AcquisitionCo**"), as the sole "**Lender**" and as the "**Agent**" under the "Credit Agreement" (as defined below; references herein to "Lender" refer to AcquisitionCo in its capacities as Lender and as Agent). Each party hereto is a "**Party**" and collectively the "**Parties**."

### A.  Senior Loans

Borrowers, Guarantors, and Israel Discount Bank of New York (as Agent and Lender, "**IDB**") are parties to that Credit and Security Agreement dated as of April 30, 2018 (as amended from time to time, the "**Senior Credit Agreement**"), providing for credit facilities in the maximum aggregate present principal amount exceeding $18,000,000. Various "**Events of Default**" occurred under the Senior Credit Agreement and, in 2019, Borrowers needed access to additional capital to continue to operate.

### B.  2019 Efforts to Sell or Finance

Beginning in December, 2018, Borrowers and Guarantors sought out entities to invest in Borrowers and Guarantors. In June, 2019, Borrowers and Guarantors engaged in formal efforts to market Borrowers and Guarantors for sale or, in the alternative, for further investment to provide Borrowers with capital necessary to permit Borrowers to continue in operation (the "**Capital Market Efforts**"). The Capital Market Efforts were led by Raymond James & Associates, Inc. ("**Raymond James**"), an investment banking firm. Raymond James reached out to approximately two hundred firms that Raymond James believed were financially capable of loaning money to Borrowers and Guarantors or making an equity investment in the enterprise of Borrowers and Guarantors. Ultimately, Borrowers and Guarantors believed that entering into the Credit Agreement with Innovatus (each as defined below) was the best alternative for Borrowers and Guarantors to pursue under the circumstances.

### C.  $22,050,000 Mezzanine Loan

Borrowers, Guarantors, and Innovatus Flagship Fund I, LP ("**Innovatus**"), a Delaware limited partnership (as Agent and sole Lender), are parties to that Credit and Security Agreement

dated as of October 1, 2019, as amended (as same may be further modified, amended, supplemented or restated from time to time, the "**Credit Agreement**"; capitalized terms not otherwise defined in this Agreement are used as defined in the Credit Agreement). The Credit Agreement provides for a Term Loan in the principal amount of up to $22,050,000, all of which has been funded.

Pursuant to the Credit Agreement, the Obligations are secured by a perfected security interest or lien upon all of the interests of the Borrowers and Guarantors (collectively "**Debtors**") in all property, whether real, personal, or mixed, or tangible or intangible, subject only to Permitted Liens. Further, pursuant to the Credit Agreement, the Obligations are secured by security interests in 100% of the equity of Man in the Arena through the joinder of the Pledgors.

Pursuant to the Senior Intercreditor Agreement, the Obligations are subordinate to the Senior Obligations in right of security, payment, and collection, to the extent and in the manner provided therein.

Pursuant to the Riddell Intercreditor Agreement, the Obligations are senior to the "Riddell Settlement Obligations," as defined therein, in right of security, payment, and collection, to the extent and in the manner provided therein.

### D.  Events of Default and Forbearance

As of the end of their fiscal year on April 30, 2020, various Events of Default existed due to the need of the Borrowers to obtain additional capital to maintain operations. Although this need existed independent of the Pandemic, the Pandemic has had a material adverse effect on the Borrowers as of and increasingly since April 30, 2020. As of July 23, 2020, many Events of Default existed under the Credit Agreement, as set forth in that Forbearance Agreement dated as of July 23, 2020, among the Borrowers, Guarantors, and Innovatus (the "**Forbearance Agreement**"). Since the execution of the Forbearance Agreement, additional Events of Default have occurred, including the failure to pay interest due monthly since July of 2020, such that a "Termination Event" has occurred thereunder and Lender and Agent are under no continuing duty to Debtors to forbear from the immediate exercise of remedies under the Loan Documents.

As of July 23, 2020, many "Events of Default" existed under the Senior Credit Agreement, as set forth in that Forbearance Agreement dated as of July 23, 2020, among the Borrowers, Guarantors, and IDB (the "**Senior Forbearance Agreement**"). Since the execution of the Senior Forbearance Agreement, IDB's advances have been made in its discretion, and the Borrowers are at risk that their working capital funding may be terminated at any time.

Since August 21, 2020, Debtors have been advised by Novo Advisors, a consulting firm specializing in work with financially troubled companies, and Brandon Fosbinder of Novo Advisors has been Chief Restructuring Officer of Debtors (other than Field to Field, Inc.). Novo Advisors and the Chief Restructuring Officer have advised Debtors on their cash and sales forecast, accounts receivable, and accounts payable aging, as well as strategic options.

Debtors believe that, as of the Closing Date, the fair market value of their assets totals less than the amount of the total of the Senior Obligations and the Obligations.

### E.  Transfer of Term Loan

As of December 3, 2020, Lender acquired the Term Loan from Innovatus Flagship Fund I, LP and became the Agent under, and the sole Lender under, the Loan Documents.

### F.  Proposed Partial Strict Foreclosure

Lender has proposed that (i) pursuant to Section 9-620 of the UCC, Lender shall accept a conveyance to Lender or its designated subsidiaries of certain of Debtors' personal property and fixtures in partial satisfaction of the Obligations and (ii) Debtors shall assign to Lender or its designated subsidiaries certain other property of nominal net value that is outside the scope of Article 9 of the UCC.  The Senior Lender has consented to this transaction, subject at all times to Senior Lender's security interests in the assets being conveyed thereby and the Senior Intercreditor Agreement.  In response, with no viable alternatives available, Debtors have negotiated this Partial Strict Foreclosure Agreement to accomplish the following purposes:

(i)       as the Obligations and the Senior Obligations, taken together, exceed the value of the Collateral, Debtors' management has a duty to conduct itself as to maximize the value of the Borrowers' business for the benefit of Borrowers' constituents in accordance with the respective priorities of their claims;

(ii)      Lender has agreed to allow Borrowers to retain certain cash to wind down their affairs in an orderly manner as described on <u>Schedule 3.1(i)</u>; and

(iii)     Lender or its designated subsidiaries have agreed to offer employment at will to certain of Borrowers' employees in the operation of a new business using the Collateral accepted by Lender or its designated subsidiaries.

### G. Acceptance and Waiver Under UCC 9-620

Pursuant to Section 9-620 of the UCC, Pledgors, as secondary obligors to the extent set forth in the Loan Documents (collectively the **"Secondary Obligors"**), wish to agree to this Agreement in full satisfaction of requirements that they so agree under Section 9-620 of the UCC and for all other purposes.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1
### DEFINITIONS AND CONSTRUCTION

1.1      **Definitions**. As used in this Agreement, in addition to the terms defined above in the Recitals or in the Credit Agreement, the following capitalized terms have the meanings set forth in this <u>Section 1.1</u>.

"**Accounts Receivable**" is defined in <u>Section 3.1(ii)</u>.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Ancillary Assets**" means Assets that are not UCC Assets.

"**Ancillary Documents**" means the agreements, instruments, and documents required by this Agreement to be delivered at the Closing.

"**Assets**" is defined in Section 3.1.

"**Assumed Transition Liabilities**" means the obligations of payment described as such in Schedule 3.1(i), being limited obligations that are assumed for the purpose of facilitating the transition of ownership of the Assets.

"**Audited Financial Statements**" is defined in Section 4.4.

"**Balance Sheet Date**" is defined in Section 4.4.

"**Benefit Plan**" means each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, medical, vision, dental, disability, welfare, Code Section 125 cafeteria, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by any Debtor for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Business or any spouse or dependent of such individual, or under which any Debtor or any of its ERISA Affiliates has or may have any Liability, or with respect to which Lender or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise.

"**Business**" means Borrowers' business of designing, manufacturing, and selling football helmets and other sports equipment.

"**Claims**" means any and all accounts, covenants, agreements, obligations, claims, debts, liabilities, offsets, demands, costs, expenses, damages, actions or causes of action of every kind, nature, character and description whatsoever, whether arising at law or equity or under statute, regulation or otherwise, and whether liquidated or unliquidated, contingent or noncontingent, known or unknown, suspected or unsuspected, including any claims based upon the alleged breach of the implied duty of good faith and fair dealing, any alleged tort, or any breach of fiduciary duty.

"**Closing**" is defined in Section 3.6.

"**Closing Date**" is defined in Section 3.6.

"**Contracts**" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"**Copyrights**" is defined in the definition of Intellectual Property.

"**Debtor Parties**" means (i) Debtors, (ii) Debtors' present and previous shareholders, directors, officers, predecessors, successors, assigns, and Affiliates, and (iii) Debtors' present and previous agents, attorneys, accountants, consultants, representatives, subsidiaries, officers, directors, and employees.

"**Debtors' Knowledge**" means the actual knowledge of any individual who is an officer of any Debtor as of the Closing Date.

"**Deficiency**" is defined in <u>Section 2.1(a)</u>.

"**Designee**" is defined in <u>Section 3.8</u>.

"**Enforceable Restrictions**" means restrictions on assignment, to the extent such restrictions are enforceable notwithstanding Sections 9-406, 9-407, and 9-408 of the UCC and any other Law that limits the enforceability of restrictions on assignment.

"**Environmental, Health, and Safety Liabilities**" means any cost, damages, expense, liability, obligation or other responsibility arising from or under any Environmental Law or Occupational Safety and Health Law, including the types of activities covered by the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA).

"**Excluded Assets**" is defined in <u>Section 3.2</u>.

"**Financial Statements**" is defined in <u>Section 4.4</u>.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Intellectual Property**" means all rights in and to, arising out of, or associated with any of the following accruing under any applicable law of any jurisdiction throughout the world, whether or not registered with any Governmental Authorities and applicable registrars: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("**Patents**"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by such indicia of source, and all registrations, applications for registration, and renewals of, any of the foregoing ("**Trademarks**"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**"); (d) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs,

websites and web pages, social media accounts and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (f) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein; (g) computer programs, operating systems, applications, firmware, and other code (whether or not patentable or copyrightable), including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; and (h) all other intellectual or industrial property and proprietary rights.

"**Intellectual Property Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, royalty agreements, covenants not to sue, waivers, releases, permissions and other Contracts relating to any Intellectual Property that is used or held for use in the conduct of the Business as currently conducted or proposed to be conducted to which any Debtor is a party, beneficiary, or otherwise bound.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by any Debtor and used or held for use in the conduct of the Business as currently conducted, together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to any Debtor with respect to such Intellectual Property; and (ii) claims and causes of action with respect to such Intellectual Property, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present and future infringement, dilution, misappropriation, misuse, breach, default or other violation thereof.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, or application by or with any Governmental Authority or applicable registrar in any jurisdiction throughout the world, including issued Patents, registered Trademarks, registered domain names and Copyrights, and pending applications for any of the foregoing.

"**Inventory**" is defined in <u>Section 3.1(iii)</u>.

"**Lender Parties**" means (i) Lender, Innovatus, and their respective participants, predecessors, successors, assigns, and Affiliates and (ii) their present and previous managers, agents, attorneys, accountants, consultants, representatives, subsidiaries, officers, directors, and employees.

"**Liability**" or "**Liabilities**" means any liabilities, obligations, or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

"**Material Contracts**" is defined in <u>Section 4.6</u>.

"**Occupational Safety and Health Law**" means any Law designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards, including the Occupational Safety and Health Act, and any program, whether governmental or private (such as

those promulgated or sponsored by industry associations and insurance companies), designed to provide safe and healthful working conditions.

"**Owned Real Property**" is defined in <u>Section 4.10(a)</u>.

"**Pandemic**" means the COVID-19 pandemic.

"**Patents**" is defined in the definition of Intellectual Property.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances, and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**PPP Funds**" is defined in <u>Section 4.19(b)</u>.

"**PPP Loan**" is defined in <u>Section 4.19(a)</u>.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching, or migration on or into the environment or into or out of any property

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

"**Retained Cash**" is defined in <u>Section 3.1(i)</u>.

"**Schedule**" refers to the applicable Section of the Disclosure Schedules delivered by the Parties concurrently with the execution and delivery of this Agreement.

"**Specified Amount**" is $15,000,000.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement, or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Trademarks**" is defined in the definition of Intellectual Property.

"**UCC**" means the Uniform Commercial Code in effect in the State of New York as of the Closing Date.

"**UCC Assets**" means Assets that are within the scope of Article 9 of the UCC.

"**Union**" is defined in <u>Section 4.15(b)</u>.

1.2    **References to Documents**. Any reference to a document shall include all schedules, exhibits, supplements, and addenda thereto (however denominated) and shall include such documents as they may be amended, modified, supplemented, or restated from time to time, unless otherwise expressly specified.

**1.3**    **References to Laws**. Unless otherwise specified, any reference to a Law, means such Law as in effect as of the Closing Date.

**1.4**    **References to this Agreement**. "Herein," "hereof" and words of similar import in this Agreement refer to the entire document and not to any particular provision thereof, unless otherwise expressly stated. References to Articles, Sections, or Schedules are to those in or included with this Agreement unless otherwise specified.

**1.5**    **Other Interpretive Conventions**. Except where this Agreement expressly provides otherwise, (i) the word "includes" and variants thereof mean "including, but not limited to", (ii) unless the context in which it is used otherwise clearly requires, the word "or" includes the conjunctive "and/or", (iii) the meanings given to terms defined herein shall be equally applicable to both the singular and plural forms thereof, and (iv) any reference to a Person is a reference to such Person or their permitted successors and assigns.

**ARTICLE 2**
**PARTIAL STRICT FORECLOSURE AND CONSENTS**

**2.1**    **Nature of and Consents to Transactions**.

(a)    **Partial Strict Foreclosure**. Pursuant to Section 9-620 of the UCC, this Agreement evidences the acceptance by Lender of the UCC Assets in satisfaction of the Specified Amount of the Obligations. All transfers of UCC Assets herein are made to further evidence such acceptance and shall have the full effect of an acceptance under Section 9-620 of the UCC, however the transfers are phrased. The Parties acknowledge that the Specified Amount is less than all of the Obligations (the remaining amount of the Obligations above the Specified Amount is the "**Deficiency**").

(b)    **Consent of Debtors**. This Agreement, entered into voluntarily during the continuation of multiple material Events of Default, constitutes a sufficient consent by Debtors to this partial strict foreclosure for all purposes under Section 9-620 of the UCC and under all other relevant Laws. Debtors acknowledge and agree that the Deficiency remains outstanding and remains owed by Debtors free of any setoff, claim, or defense, and, with respect to the Deficiency, Lender shall continue to have the benefits of all agreements supporting the Obligations other than the security interest of Lender in the UCC Assets conveyed hereby. Without limitation, (i) Debtors remain liable for the Deficiency and (ii) the contractual obligations of subordination provided in the Riddell Intercreditor Agreement remain in full effect against Debtors and against the holder of the Riddell Settlement Obligations. The contractual obligations of subordination provided in the Senior Intercreditor Agreement remain in full effect with respect to the Deficiency.

(c)    **Consent of Secondary Obligors**. This Agreement, entered into voluntarily during the continuation of multiple material Events of Default, constitutes a sufficient consent by the Secondary Obligors to this partial strict foreclosure for all purposes under Section 9-620 of the UCC and under all other relevant Laws. Secondary Obligors acknowledge and agree that the Deficiency remains outstanding and remains owed by Debtors free of any setoff, claim, or defense, and, with respect to the Deficiency, Lender shall continue to have the benefits of all security provided by Debtors and Secondary Obligors under the Loan Documents and all other agreements

of Debtors and Secondary Obligors supporting the Obligations other than the security interest of Lender in the UCC Assets conveyed hereby. Without limitation, (i) the Guarantors remain liable for the Deficiency, (ii) the security interest granted by the Pledgors continues to secure the Deficiency, and (iii) the contractual obligations of subordination provided in the Riddell Intercreditor Agreement remain in full effect. The contractual obligations of subordination provided in the Senior Intercreditor Agreement remain in full effect with respect to the Deficiency.

(d)    **Suretyship Waivers.**  Guarantors waive any right of indemnification, exoneration, subrogation, contribution, and any other such right that Guarantors may otherwise have against any Person arising from the transactions described in this Agreement.

2.2    **Additional Conveyances**. This Agreement provides for Debtors' transfer of real estate listed on Schedule 3.1(vii) and other property that are not UCC Assets.  The Ancillary Assets are acknowledged to have nominal economic value, taking into account the encumbrance thereof to secure the Senior Obligations.

2.3    **Further Waivers**. Without limiting any other provision of this Agreement, each Debtor and each Secondary Obligor (a) agrees that it has received notice sufficient for compliance with Sections 9-620 and 9-621 of the UCC and, in the alternative, hereby expressly waives (i) any requirement for receipt of such notice and any right to notification of sale, transfer, conveyance, or surrender of the Assets pursuant to Sections 9-620 and 9-621 of the UCC or otherwise, and (ii) any remedies, rights, defenses, or actions it might have as a result of failure to have received such notice; (b) waives the right to redeem the Assets under Section 9-623 of the UCC or otherwise; (c) waives any right to object to the sale, transfer, conveyance, delivery, or surrender of the Assets pursuant to Section 9-620 of the UCC or otherwise; (d) waives any obligation Lender may have to dispose of the Assets; (e) waives any other right, whether legal or equitable, that it may have in and to the Assets; (f) agrees that the transactions contemplated herein are consummated in good faith and are commercially reasonable; and (g) waives any prior notice period set forth in the UCC or other applicable Law. Each Debtor and each Secondary Obligor severally acknowledges and agrees that the waivers set forth in this Section and elsewhere in this Agreement constitute material consideration for the agreement of Lender to execute and deliver this Agreement.

## ARTICLE 3
## TRANSFER AND ACCEPTANCE

3.1    **Transfer and Acceptance of Assets**. Subject to the terms and conditions of this Agreement, pursuant to Section 9-620 of the UCC as to the UCC Assets and pursuant to other applicable law as to the Ancillary Assets, each Debtor shall assign, transfer, convey, and deliver to Lender or its Designee, and Lender or its Designee shall thereby acquire and accept from each Debtor, all of such Debtor's right, title, and interest in, to, and under all of such Debtor's assets, properties, and rights of every kind and nature, whether real, personal, or mixed, tangible or intangible (including goodwill), wherever located, and whether now existing or hereafter acquired (other than the Excluded Assets; the assets being so transferred are collectively the "**Assets**"), including the following:

(i)      cash and cash equivalents, all of which are described on <u>Schedule 3.1(i)</u>, except that Kranos Corporation may retain cash in the amount and for the purposes set forth on <u>Schedule 3.1(i)</u> (the "**Retained Cash**");

(ii)     all accounts or notes receivable held by each Debtor, and any security, claim, remedy or other right related to any of the foregoing (collectively the "**Accounts Receivable**"), including the accounts described on <u>Schedule 3.1(ii)</u>, which is a materially complete list thereof as of the Closing Date;

(iii)    all work in progress, packaging, supplies, parts, and other inventories ("**Inventory**"), including the property described on <u>Schedule 3.1(iii)</u>, which is a materially complete list thereof as of the Closing Date;

(iv)     subject to any Enforceable Restrictions on assignment or transfer, all Contracts, including the Material Contracts set forth on <u>Schedule 4.6</u>;

(v)      all Intellectual Property Assets, including those described on <u>Schedule 3.1(v)</u>, which is a materially complete list thereof as of the Closing Date;

(vi)     all furniture, fixtures, equipment, machinery, tools, office equipment, supplies, computers, telephones and other tangible personal property, including those described on <u>Schedule 3.1(vi)</u>, which is a materially complete list thereof as of the Closing Date;

(vii)    the real property described in <u>Schedule 3.1(vii)</u>;

(viii)   subject to any Enforceable Restrictions on assignment or transfer, all Permits that are held by each Debtor and required for the conduct of the Business as currently conducted or for the ownership and use of the Assets, including those listed on <u>Schedule 3.1(viii)</u>, which is a materially complete list thereof as of the Closing Date;

(ix)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums, and fees, including those described on <u>Schedule 3.1(ix)</u>, which is a materially complete list thereof as of the Closing Date;

(x)      all rights to any Actions of any nature available to or being pursued by any Debtor to the extent related to the Business or the Assets;

(xi)     all of each Debtor's rights under warranties, indemnities, and all similar rights against third parties to the extent related to any Assets;

(xii)    all insurance benefits, including rights and proceeds, arising from or relating to the Business or the Assets;

(xiii)   except for records listed in <u>Section 3.2(ii)</u>, originals or, where not available, digital copies, of all books and records; and

(xiv)   all goodwill of the Business.

**3.2     Excluded Assets**. The Assets shall not include the following (being the "**Excluded Assets**"):

(i)     the Retained Cash;

(ii)    the originals of each Debtor's corporate minute books and related corporate records;

(iii)   the rights that accrue or will accrue to each Debtor under this Agreement or the Ancillary Documents; and

(iv)    the property described in <u>Schedule 3.2(iv)</u>.

**3.3     Title to Assets; No Assumption of Liabilities**.

(a)     **UCC Assets**.  At the Closing, Lender or its Designee(s) shall acquire all of Debtors' interest in the UCC Assets, including all Contracts, to the full extent provided in Section 9-621 of the UCC, and including with the termination of junior Liens by operation of law (including termination of Senior Lender's junior Lien upon certain intellectual property).  Such acquisition is of Debtors' rights in the UCC Assets but does not imply or cause any assumption by Lender of any liability under any Contract or other UCC Asset, and Lender has not agreed to assume or incur any liability whatsoever under any Contract or other UCC Asset other than the Assumed Transition Liabilities.

(b)     **Ancillary Assets**.  At the Closing, Lender or its Designee(s) shall acquire all of Debtors' interest in the Ancillary Assets to the extent of Debtors' ability to convey the same.  Such conveyance shall be made free of any Lien other than the Lien securing the Senior Obligations and those, if any, disclosed in the title insurance policies issued to Schutt Sports RE LLC.  Such acquisition is of Debtors' rights in the Ancillary Assets but does not imply or cause any assumption by Lender of any liability under any Ancillary Asset, and Lender has not agreed to assume or incur any liability whatsoever under any Ancillary Asset other than the Assumed Transition Liabilities.

(c)     **Limited Assumption**.  Lender has not agreed to assume any obligation whatsoever of any Debtor that may arise from or relate to the Assets other than the Assumed Transition Liabilities.  Lender hereby assumes the Assumed Transition Liabilities and agrees to pay them as they become due.

(d)     **Rights of Senior Lender**.  To avoid doubt, Debtors shall remain primarily liable on the Senior Obligations as "Borrowers" and "Guarantors," and the obligations of Debtors and the Secondary Obligors with respect to the Senior Obligations are not impaired by this Agreement or the Closing in any respect.

**3.4     Consideration**.

(a)     **Amount of Consideration**.  The consideration for the transfer and acceptance of Assets and Debtors' other performances hereunder is the deemed satisfaction of the Specified Amount of the Obligations.

(b)     **[Reserved]**.

3.5     **Certain Third-Party Consents**. To the extent that Debtors' rights under any Contract or Permit that is an Asset, or any other Asset, may not be assigned to Lender by the partial strict foreclosure provided for in this Agreement without the consent of another Person pursuant to an Enforceable Restriction, this Agreement shall not constitute an agreement to assign the same to the extent that an attempted assignment would constitute a breach thereof or be unlawful, and each Debtor shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible to the extent Lender specifically requests in writing, and Lender shall pay the reasonable expenses of Debtors incurred in such efforts. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Lender's rights under the Asset in question so that Lender would not in effect acquire the benefit of all such rights, each Debtor, to the maximum extent permitted by Law, at Lender's request and direction, shall act after the Closing as Lender's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law, with Lender in any other reasonable arrangement designed to provide such benefits to Lender. The Parties acknowledge that if economic rights or other partial rights under such Contract or Permit may be assigned to Lender without such required consent, such partial rights shall be deemed assigned at the Closing.  To avoid doubt, Lender is under no obligation whatsoever to obtain any such consent or to assume liability for any obligations under any Contract or Permit in order to obtain any such consent. To avoid doubt, Debtors are under no obligation to incur any costs to honor any obligations or any liability to obtain any such consent.

3.6     **Closing**. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place effective as of the date hereof (the "**Closing Date**") upon the electronic release of signatures coordinated by Bradley Arant Boult Cummings LLP, 1600 Division Street, Suite 700, Nashville, Tennessee 37203. The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date.

3.7     **Closing Deliverables**.

(a)     **Debtor Deliveries**. At the Closing, Debtors shall deliver to Lender the following:

(i)     UCC Foreclosure Bills of Sale and Assignments duly executed by Debtors, transferring the UCC Assets and the Ancillary Assets to Lender's Designees in accordance with Section 3.8;

(ii)     [reserved];

(iii)     for each bank account maintained by Debtors, either (A) an assignment approved by the depository bank transferring the account to Lender or its Designee, or (B) evidence of the closure of such account and the delivery to Lender or its Designee of all deposits in such account; provided, however, that Kranos Corporation may

maintain open one deposit account to hold the Retained Cash for expenditure as required by this Agreement, provided that such account shall be subject to a control agreement in favor of Lender pursuant to which Lender shall allow payments from such account only for the purposes set forth on Schedule 3.1(i);

(iv)     for each titled vehicle or other tangible property for which a title registration is maintained, documents sufficient to transfer record ownership to Lender or its Designee;

(v)      for each registered trademark, patent, copyright, or application therefor, assignments in recordable form sufficient to transfer record ownership to Lender or its Designee;

(vi)     a Warranty Deed in recordable form conveying to Lender or its Designee the Owned Real Property known as 710 South Industrial Drive, Litchfield, Illinois, together with any other certificates or other documents required under local law to register such conveyance;

(vii)    an owner's affidavit or other customary documents required for Lender to obtain an owner's title policy in customary form on 710 South Industrial Drive, Litchfield, Illinois;

(viii)   a Warranty Deed in recordable form conveying to Lender or its Designee the Owned Real Property known as 610 South Industrial Drive, Litchfield, Illinois, together with any other certificates or other documents required under local law to register such conveyance;

(ix)     an owner's affidavit or other customary documents required for Lender to obtain an owner's title policy in customary form on 610 South Industrial Drive, Litchfield, Illinois;

(x)      a Warranty Deed in recordable form conveying to Lender or its Designee the Owned Real Property known as 2510 South Broadway, Salem, Illinois, together with any other certificates or other documents required under local law to register such conveyance;

(xi)     an owner's affidavit or other customary documents required for Lender to obtain an owner's title policy in customary form on 2510 South Broadway, Salem, Illinois;

(xii)    an Assignment and Assumption Agreement regarding Benefit Plans to evidence the assignment of the Benefit Plans;

(xiii)   an Officer's Certificate executed by Barbara Crispens, Vice President of Finance and Secretary of each Debtor, confirming that she has reviewed this Agreement and the Schedules and that, to her knowledge, the lists of cash in Schedule 3.1(i), of Accounts Receivable in Schedule 3.1(ii), of prepaid expenses in Schedule 3.1(ix), and of trade payables in Schedule 3.3, are correct in all material respects;

(xiv)    an Officer's Certificate executed by Robert E. Erb, Jr., Chief Executive Officer of each Debtor, confirming that he has reviewed this Agreement and the Disclosure Schedules and that, to his knowledge, the representations made in <u>Article 4</u> are correct in all material respects;

(xv)    an Officer's Certificate executed by Brandon Fosbinder, Chief Restructuring Officer of each Debtor other than Field to Field, Inc., confirming that he has reviewed this Agreement and the Disclosure Schedules and that, to his knowledge, none of the representations made in <u>Article 4</u> are incorrect in any material respect;

(xvi)    an Officer's Certificate executed by James A. Stutts, Jr., President and Chief Operating Officer of each Debtor, confirming that he has reviewed this Agreement and the Disclosure Schedules and that, to his knowledge, the representations made in <u>Article 4</u> are correct in all material respects;

(xvii)    copies of invoices or other supporting documents relating to the uses of Retained Cash;

(xviii)    consents listed in <u>Schedule 4.3</u>, to the extent so required by Lender;

(xix)    a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that no Debtor is a foreign person within the meaning of Section 1445 of the Internal Revenue Code duly executed by Debtors;

(xx)    a certificate of the Secretary or Assistant Secretary (or equivalent officer) of each Debtor certifying as to (A) the resolutions of the board of directors of each Debtor, duly adopted and in effect, which authorize the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of each Debtor authorized to sign this Agreement and the documents to be delivered hereunder;

(xxi)    a certificate of the Secretary or Assistant Secretary (or equivalent officer) of each Guarantor certifying as to (A) the resolutions of the board of directors of each Guarantor, duly adopted and in effect, which authorize the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (B) the names and signatures of the officers of each Guarantor authorized to sign this Agreement and the documents to be delivered hereunder;

(xxii)    evidence that Field to Field, Inc. has changed its name of record with all governmental authorities (or has made due provision to change its name of record within two Business Days of Closing) to a name approved by Lender that is reasonably distinct from such Debtor's present name;

(xxiii)    such documents as Lender may require to effect the assignment of Debtors' right to receive tax refunds and return of unused proceeds of a workers compensation bond deposited with the State of Illinois, as required by <u>Section 9.1</u>; and

(xxiv)  such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Lender and Debtors, as may be required to give effect to this Agreement.

(b)    **Lender Deliveries**. At the Closing, Lender shall deliver to Debtors the following:

(i)    any Debtor deliveries described in 3.7(a) that require execution by Lender or by its Designee;

(ii)    consent of Senior Lender to this Agreement, waiving further notice and acknowledging the effect of this Agreement as to Liens held by Senior Lender; and

(iii)    a release and waiver agreement substantially in the form of the release and waiver set forth in <u>Section 9.3</u> executed by Innovatus in favor of the Debtor Parties and the Pledgors.

**3.8    Lender Designees**.  Lender hereby designates the following Delaware limited liability companies to receive the conveyances of the Assets from the respective Debtors (each such Person, a "**Designee**"):

| Debtor | Lender Designee |
|---|---|
| KRANOS CORPORATION | Schutt Sports LLC |
| KRANOS RE CORPORATION | Schutt Sports RE LLC |
| KRANOS IP CORPORATION | Schutt Sports IP LLC |
| KRANOS IP II CORPORATION | Schutt Sports IP LLC |
| KRANOS IP III CORPORATION | Schutt Sports IP LLC |
| KRANOS DIAMOND SPORTS INC. | Schutt Sports IP LLC (registered IP) Schutt Sports LLC (all other assets) |
| FIELD TO FIELD, INC. | Schutt Sports IP LLC (registered IP) Field to Field LLC (all other assets) |
| MAN IN THE ARENA, INC. | Schutt Sports LLC |
| KRANOS HOLDING CORPORATION | Schutt Sports LLC |
| KRANOS INTERMEDIATE HOLDING CORPORATION | Schutt Sports LLC |

| KRANOS ACQUISITION CORPORATION | Schutt Sports LLC |
|---|---|

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF DEBTORS

Debtors jointly and severally represent and warrant to Lender that the statements contained in the Recitals hereto and in this <u>Article 4</u> are true and correct as of the Closing Date.

**4.1** **Organization and Qualification of Debtors**. Each Debtor is a corporation duly organized, validly existing, and in good standing under the Laws of the state of Delaware and has full corporate power and authority to own, operate, or lease the properties and assets now owned, operated, or leased by it and to carry on the Business as currently conducted. <u>Schedule 4.1</u> sets forth each jurisdiction in which each Debtor is licensed or qualified to do business, and each Debtor is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary. No Debtor has any Subsidiaries except for other Debtors.

**4.2** **Authority of Debtors**. Each Debtor has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which such Debtor is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each Debtor of this Agreement and any Ancillary Document to which each Debtor is a party, the performance by each Debtor of its obligations hereunder and thereunder, and the consummation by each Debtor of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite corporate action on the part of each Debtor. This Agreement has been duly executed and delivered by each Debtor, and (assuming due authorization, execution, and delivery by Lender) this Agreement constitutes a legal, valid, and binding obligation of each Debtor enforceable against such Debtor in accordance with its terms, except to the extent such enforcement is limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (b) laws related to the availability of specific performance, injunctive relief, or other equitable remedies, and (c) general principles of equity or public policy. When each Ancillary Document to which any Debtor is or will be a party has been duly executed and delivered by the applicable Debtor (assuming due authorization, execution, and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of such Debtor enforceable against it in accordance with its terms, except to the extent such enforcement is limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (b) laws related to the availability of specific performance, injunctive relief or other equitable remedies, and (c) general principles of equity or public policy.

**4.3** **No Conflicts; Consents**. The execution, delivery, and performance by each Debtor of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws, or other organizational documents of any Debtor; (b) conflict with or result in a violation or

breach of any provision of any Law or Governmental Order applicable to any Debtor, the Business, or the Assets; (c) except as set forth in Schedule 4.3, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Material Contract or any Permit to which any Debtor is a party or by which any Debtor or the Business is bound or to which any of the Assets are subject; or (d) result in the creation or imposition of any Lien other than Permitted Liens on the Assets. No consent, approval, Permit, Governmental Order, declaration, or filing with, or notice to, any Governmental Authority is required by or with respect to any Debtor in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

4.4    **Financial Statements**. Complete copies of the consolidated audited financial statements consisting of the balance sheet of Kranos Holding Corporation and its subsidiaries (Kranos Intermediate Holding Corporation, Kranos Acquisition Corporation, and Borrowers) as at April 30, 2020, and the related statements of operations, stockholders' equity, and cash flows for the year then ended (the "**Audited Financial Statement**"), and unaudited consolidated financial statements consisting of the balance sheet of the Business for the years ending April 30, 2018 and April 30, 2019, and for the six-month period ending October 31, 2020 (the "**Balance Sheet Date**"), the related statements of income and retained earnings, stockholders' equity, and cash flow for the periods then ended (together with the Audited Financial Statements, the "**Financial Statements**") have been delivered to Lender. To Debtors' Knowledge, the Audited Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, and all Financial Statements are based on the books and records of the Business, and fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.

4.5    **Undisclosed Liabilities**. To Debtors' Knowledge, no Debtor has Liabilities with respect to the Business, except (a) those which are adequately reflected or reserved against in the balance sheet issued as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and that are not, individually or in the aggregate, material in amount.

4.6    **Material Contracts**.

(a)    **List of Material Contracts**. Schedule 4.6 lists each of the following Contracts (x) by which any of the Assets are bound or affected or (y) to which any Debtor is a party or by which it is bound in connection with the Business or the Assets (such Contracts, together with all Intellectual Property Agreements being "**Material Contracts**"):

(i)    all Contracts involving aggregate consideration in excess of $250,000 and that, in each case, cannot be cancelled without penalty or without more than ninety (90) days' notice;

(ii)    all Contracts that require a Debtor to purchase or sell a stated portion of the requirements or outputs of the Business or that contain "take or pay" provisions;

(iii)     all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental, or other Liability of any Person;

(iv)     all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person, or any real property (whether by merger, sale of stock, sale of assets, or otherwise);

(v)      all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting, and advertising Contracts;

(vi)     all employment agreements or Contracts with independent contractors or consultants (or similar arrangements) that are not cancellable without material penalty or without more than ninety (90) days' notice;

(vii)    except for Contracts relating to trade receivables, all Contracts relating to Obligations (including guarantees);

(viii)   all Contracts with any Governmental Authority;

(ix)     all Contracts that limit or purport to limit the ability of a Debtor to compete in any line of business or with any Person or in any geographic area or during any period of time;

(x)      all joint venture, partnership, or similar Contracts;

(xi)     all Contracts for the sale of any of the Assets or for the grant to any Person of any option, right of first refusal, or preferential or similar right to purchase any of the Assets;

(xii)    all powers of attorney with respect to the Business or any Asset;

(xiii)   all collective bargaining agreements or Contracts with any Union;

(xiv)    all Contracts related to any Debtor Benefit Plan; and

(xv)     all other Contracts that are material to the Assets or the operation of the Business and not previously disclosed pursuant to this Section 4.6(b).

(b)      **Status of Material Contracts**. Each Material Contract is valid and binding on the applicable Debtor in accordance with its terms and, assuming no default or breach by any other party to each Material Contract, each is in full force and effect. No Debtor has received notice that it is in breach of or default under (or is alleged to be in breach of or default under) in any material respect, or has provided or received any notice of any intention to terminate, any Material Contract.  No Debtor has received notice that any event or circumstance has occurred that, with a lapse of time, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments, and supplements thereto and waivers

thereunder) have been made available to Debtors. Except at disclosed on attached <u>Schedule 4.6</u>, to Debtors' Knowledge, there are no material disputes pending or threatened under any Contract included in the Assets.

**4.7    Title to Assets**. Each Debtor has good and valid title to, or a valid leasehold interest in, all of the Assets owned by such Debtor, free of any Liens other than Permitted Liens.  The title to the Assets as conveyed and accepted pursuant to this Agreement shall be as described in <u>Section 3.3</u>.

**4.8    Sufficiency of Assets**.  Except for the potential omission of any Contracts or Permits listed on <u>Schedule 3.1(viii)</u> for which consent is necessary but not obtained, the Assets constitute all of the rights, property, and assets necessary to conduct the Business as currently conducted. None of the Excluded Assets are material to the Business.

**4.9    Legal Proceedings; Governmental Orders**.

(a)    **Proceedings**.  Except as set forth in <u>Schedule 4.9(a)</u>, there are no Actions pending or, to Debtors' Knowledge, threatened against or by any Debtor relating to or affecting the Business or the Assets.

(b)    **Orders**.  Except as set forth in <u>Schedule 4.9(b)</u>, there are no outstanding Governmental Orders against, relating to, or affecting the Business or the Assets.

**4.10    Real Property**.

(a)    **Owned Real Property**.  <u>Schedule 3.1(vii)</u> sets forth each parcel of real property owned by any Debtor (together with all buildings, fixtures, structures, and improvements situated thereon and all easements, rights-of-way, and other rights and privileges appurtenant thereto, collectively, the "**Owned Real Property**"), including, with respect to each property, the address location and use. Debtors have delivered to Lender copies of the deeds and other instruments (as recorded) by which the applicable Debtor acquired such parcel of Owned Real Property, and copies of all title insurance policies, opinions, abstracts, and surveys in the possession of Debtors with respect to such parcel. With respect to each parcel of Owned Real Property:

(i)    the applicable Debtor has good and marketable fee simple title, free and clear of all Liens, except for Permitted Liens;

(ii)    the applicable Debtor has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and

(iii)    no Debtor has granted any unrecorded outstanding options, rights of first offer, or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)    **Status of Owned Real Property**.  No Debtor has received any written notice of (i) material violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Owned Real Property, (ii) existing, pending, or threatened

condemnation proceedings affecting the Owned Real Property, or (iii) existing, pending, or threatened zoning, building code, or other moratorium proceedings, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Owned Real Property as currently operated. Neither the whole nor any material portion of any Owned Real Property is presently materially damaged by fire or other casualty.

**4.11    Intellectual Property**.

(a)    **Intellectual Property Assets**. Schedule 3.1(v) contains a correct, current, and complete list of: (i) all Intellectual Property Registrations, specifying as to each, as applicable: the title, mark, or design; the jurisdiction by or in which it has been issued, registered, or filed; the patent, registration, and application serial number; the issue, registration, and filing date; and the current status; and (ii) all proprietary software included in the Intellectual Property Assets (excluding off-the-shelf software that is commercially available pursuant to shrink-wrap, click-through, or other standard form agreements). All required filings and fees related to the Intellectual Property Registrations have been timely filed with and paid to the relevant Governmental Authorities and applicable registrars, and all Intellectual Property Registrations are otherwise in good standing. Debtors have made available to Lender all file histories, documents, certificates, office actions, correspondence, and other materials related to all Intellectual Property Registrations.

(b)    **Intellectual Property Agreements**. Schedule 4.11(b) contains a correct, current, and complete list of all material Intellectual Property Agreements, specifying for each the date, title, and parties thereto. Each Debtor has made available all such Intellectual Property Agreements (excluding customer, end-user, or other similar agreements entered into in the ordinary course of business), including all modifications, amendments, and supplements thereto and waivers thereunder. Each Intellectual Property Agreement is valid and binding on the applicable Debtor in accordance with its terms and is in full force and effect. Neither a Debtor nor, to Debtors' Knowledge, any other party thereto is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal) any Intellectual Property Agreement.

(c)    **Full Force and Effect**. To Debtors' Knowledge, all of the Intellectual Property Assets are valid and enforceable, and all Intellectual Property Registrations are subsisting and in full force and effect. To Debtors' Knowledge, Debtors have taken all necessary steps to maintain and enforce the Intellectual Property.

(d)    **No Infringement by Debtors**. To Debtors' Knowledge, the conduct of the Business as currently conducted, including the use of the Intellectual Property Assets in connection therewith, and the products, processes, and services of the Business have not infringed, misappropriated, or otherwise violated the Intellectual Property or other rights of any Person. To Debtors' Knowledge, no Person is currently infringing, misappropriating, or otherwise violating any Intellectual Property Assets.

**4.12    Accounts Receivable**. The Accounts Receivable described on Schedule 3.1(ii) have arisen from bona fide transactions entered into by Debtors involving the sale of goods in the ordinary course of business consistent with past practice.

**4.13** **Customers**. Schedule 4.13 lists the top ten customers of Debtors as determined by revenue received from customers in Debtors' fiscal year ended April 30, 2020. Debtors have not received any notice that any of its material customers has ceased, or intends to cease after the Closing, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business, except for reductions in orders arising from the Pandemic.

**4.14** **Employee Benefit Matters**.

(a) **Benefit Information**. Schedule 4.14(a) lists all of the Benefit Plans of each Debtor. Debtors have made available to Lender all records pertaining to Debtors' Benefit Plans.

(b) **Certain Plans and Events**. With respect to each Benefit Plan, (i) no such plan is a "multiple employer plan" within the meaning of Section 413(c) of the Code or a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA), and (ii) no "reportable event," as defined in Section 4043 of ERISA, with respect to which the reporting requirement has not been waived, has occurred with respect to any such plan.

**4.15** **Employment Matters**.

(a) **Disclosure of Employees**. Schedule 4.15(a) lists all persons who are employees of Debtors as of the Closing Date, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following: (i) name; (ii) employer; (iii) title or position (including whether full-time or part-time); (iv) hire or retention date; (v) current annual base compensation rate or contract fee; (vi) commission, bonus, or other incentive-based compensation; and (vii) a description of the fringe benefits provided to each such individual as of the Closing Date. Except as set forth in Schedule 4.15(a), as of the Closing Date, all compensation, including wages, commissions, bonuses, fees, and other compensation, payable to all employees, independent contractors, or consultants of Debtors for services performed on or prior to the Closing Date have been paid in full and there are no outstanding agreements, understandings, or commitments of Debtors with respect to any compensation, commissions, bonuses, or fees.

(b) **Union Relationships**. Except as set forth on Schedule 4.15(b), no Debtor is, or has been, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council, or labor organization (collectively, "**Union**"), and there is not, and has not been, any Union representing or purporting to represent any employee of any Debtor, and, to Debtors' Knowledge, no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining.

(c) **Employment Law Compliance**. Each Debtor is and has been in compliance in all material respects with Contracts listed on Schedule 4.15(a) and all applicable Laws pertaining to employment and employment practices to the extent they relate to employees, volunteers, interns, consultants, and independent contractors of Debtors, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion, and termination of employees, working conditions, meal and break periods, privacy, health and safety,

workers' compensation, leaves of absence, paid sick leave, and unemployment insurance. All individuals characterized and treated by any Debtor as consultants or independent contractors of such Debtor are properly treated as independent contractors under all applicable Laws. All employees of Debtors classified as exempt under the Fair Labor Standards Act and state and local wage and hour laws are properly classified in all material respects. Each Debtor is in compliance with and has complied with all immigration laws, including Form I-9 requirements and any applicable mandatory E-Verify obligations.

**4.16    Taxes**. Except as set forth in <u>Schedule 4.16</u>:

(i)      All Tax Returns required to be filed by any Debtor prior to the Closing Date have been timely filed. Such Tax Returns are true, complete, and correct in all material respects. All Taxes due and owing by any Debtor (whether or not shown on any Tax Return) prior to the Closing Date have been timely paid.

(ii)     Each Debtor has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder, or other party, and materially complied with all information reporting and backup withholding provisions of applicable Law.

(iii)    No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of any Debtor.

(iv)     All deficiencies asserted, or assessments made, against any Debtor as a result of any examinations by any taxing authority have been fully paid.

(v)      No Debtor is a party to any Action by any taxing authority. There are no pending or, to Debtors' Knowledge, threatened Actions by any taxing authority.

(vi)     There are no Liens for Taxes upon any of the Assets (other than Permitted Liens) nor, to Debtors' Knowledge, is any taxing authority in the process of imposing any Liens for Taxes on any of the Assets (other than for current Taxes not yet due and payable).

**4.17    Environmental Matters**. Except as disclosed in <u>Schedule 4.17</u>:

(a)      To Debtors' Knowledge, Debtors are, and all times have been, in material compliance with all Environmental Laws. No Debtor has any basis to expect, nor has any Debtor or any other Person for whose conduct Debtors are or may be held to be responsible received any actual or threatened order, notice, or other communication from (i) any Governmental Authority or private citizen acting in the public interest or (ii) the current or prior owner or operator of the Owned Real Property, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or threatened obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to the Owned Real Property or other property or asset (whether real, personal, or mixed) in which Debtors have or have had an interest, or with respect to any property or facility at or to which Hazardous Materials were generated, c, or processed by any Debtor or any other Person for whose conduct any Debtor is or may be held

responsible, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(b)     There are no pending or, to Debtors' Knowledge, threatened claims, Liens, or other restrictions of any nature resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law with respect to or affecting the Owned Real Property or any other property or asset (whether real, personal, or mixed) in which Debtors have or have had an interest.

(c)     No Debtor or any other Person for whose conduct they are or may be held responsible, has received, and to Debtors' Knowledge, there is no reason to expect, any citation, directive, inquiry, notice, order, summons, warning, or other communication that relates to Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any Owned Real Property or property or asset (whether real, personal, or mixed) in which Debtors have or have had an interest, or with respect to any property or facility to which Hazardous Materials generated, manufactured, refined, transferred, imported, used, or processed by Debtors or any other Person for whose conduct Debtors are or may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(d)     Neither Debtors nor any other Person for whose conduct Debtors are or may be held responsible has knowledge of any Environmental, Health, and Safety Liabilities with respect to the Owned Real Property or, to Debtors' Knowledge, with respect to any other property or asset (whether real, personal, or mixed) in which Debtors (or any of their predecessors) have or have had an interest or at any property geologically or hydrologically adjoining the Owned Real Property or any such other property or asset.

(e)     No Debtor has, and to Debtors' Knowledge, no other Person has, stored in violation of any Law any Hazardous Materials in barrels, aboveground or underground storage tanks, landfills, land deposits, dumps, equipment (whether movable or fixed), or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Owned Real Property or such adjoining property, or incorporated into any structure therein or thereon.

(f)     No Debtor has been notified of, and to Debtors' Knowledge, there has not been, any Release of any Hazardous Materials at or from the Owned Real Property or at any other location where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, or processed from or by the Owned Real Property, or from any other property or asset (whether real, personal, or mixed) in which Debtors have or have had an interest.

(g)     Debtors have delivered to Lender true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by any Debtor pertaining to Hazardous Materials in, on, or under the Owned Real Property or any real property currently or formerly owned, leased, or operated by Debtors, or concerning compliance, by Debtors or any other Person for whose conduct Debtors are or may be held responsible, with Environmental Laws.

**4.18    Inventory**. The list of Debtors' Inventory on Schedule 3.1(iii) is materially complete.

**4.19    PPP Loan** .

(a)    Kranos Holding Corporation has unsecured indebtedness owed to Meridian Bank in the amount of $3,060,800 (the "**PPP Loan**") obtained pursuant to the "Payroll Protection Program" under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act.

(b)    The proceeds of the PPP Loan (the "**PPP Funds**") have been disbursed in a manner that allows the tracking of their use in accordance with the applicable law and to support Debtor's right to obtain forgiveness of the entire amount of the PPP Loan. Kranos Corporation has completed a forgiveness application reflecting its use of all of the PPP Funds and submitted it, together with any required supporting documentation, to Meridian Bank. Such forgiveness application and supporting documentation are all of the documents necessary to make Debtor's claim for forgiveness of the full amount of the PPP Loan. Meridian Bank has advised Kranos Corporation that it has transmitted Kranos Corporation's forgiveness application to the Small Business Administration on October 26, 2020, and that Meridian Bank has preliminarily approved the application.

**4.20    Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of any Debtor.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF GUARANTORS

Guarantors jointly and severally represent and warrant to Lender that the statements contained in the Recitals hereto and in this Article 5 are true and correct as of the Closing Date.

**5.1    Organization and Qualification of Guarantors**. Each Guarantor is a corporation duly organized, validly existing, and in good standing under the Laws of the state of Delaware and has full corporate power and authority to own, operate, or lease the properties and assets now owned, operated, or leased by it and to carry on the Business as currently conducted. Schedule 5.1 sets forth each jurisdiction in which each Guarantor is licensed or qualified to do business, and each Guarantor is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of its assets or the operation of its business as currently conducted makes such licensing or qualification necessary.

**5.2    Authority of Guarantor**. Each Guarantor has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which such Guarantor is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each Guarantor of this Agreement and any Ancillary Document to which such Guarantor is a party, the performance by such Guarantor of its obligations hereunder and thereunder, and the consummation by such Guarantor of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of such Guarantor. This Agreement has been duly executed

and delivered by each Guarantor, and (assuming due authorization, execution, and delivery by Lender) this Agreement constitutes a legal, valid, and binding obligation of each Guarantor enforceable against each Guarantor in accordance with its terms, except to the extent such enforcement is limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) laws related to the availability of specific performance, injunctive relief, or other equitable remedies, and (c) general principles of equity or public policy. When each Ancillary Document to which a Guarantor is or will be a party has been duly executed and delivered by such Guarantor (assuming due authorization, execution, and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of such Guarantor enforceable against it in accordance with its terms, except to the extent such enforcement is limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, (b) laws related to the availability of specific performance, injunctive relief or other equitable remedies, and (c) general principles of equity or public policy.

5.3     **No Conflicts; Consents**.   Except as set forth in Schedule 5.3, the execution, delivery, and performance by Guarantors of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws, or other organizational documents of any Guarantor; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to any Guarantor, or the business or assets of any Guarantor; (c) require the consent, notice, or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel any Contract or Permit to which any Guarantor is a party or by which any Guarantor or the assets or business of any Guarantor are bound (including any Contract to which any Guarantor is party or by which its assets or business are bound); or (d) result in the creation or imposition of any Lien other than Permitted Liens on any Guarantor's assets. No consent, approval, Permit, Governmental Order, declaration, or filing with, or notice to, any Governmental Authority is required by or with respect to any Guarantor in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

5.4     **Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of any Guarantor.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PLEDGORS

Each Pledgor severally represents and warrants to Lender that the statements contained in the Recitals hereto and in this Article 6 are true and correct as of the Closing Date.

**6.1**    **No Conflicts; Consents**.  Except as set forth in <u>Schedule 6.1</u>, the execution, delivery, and performance by Pledgor of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to such Pledgor, or the business or assets of such Pledgor; (b) require the consent, notice, or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify, or cancel any Contract or Permit to which such Pledgor is a party or by which such Pledgor or the assets or business of such Pledgor are bound (including any Contract to which such Pledgor is party or by which its assets or business are bound); or (c) result in the creation or imposition of any Lien other than Permitted Liens on any Collateral pledged by such Pledgor. No consent, approval, Permit, Governmental Order, declaration, or filing with, or notice to, any Governmental Authority is required by or with respect to such Pledgor in connection with the execution and delivery of this Agreement or any of the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

**6.2**    **Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of such Pledgor.

**ARTICLE 7**
**REPRESENTATIONS AND WARRANTIES OF LENDER**

Lender represents and warrants to Debtors and Guarantors that the statements contained in this <u>Article 7</u> are true and correct as of the Closing Date.

**7.1**    **Organization and Authority of Lender; Enforceability**. Lender is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware. Lender has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Lender of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Lender. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Lender, and (assuming due authorization, execution, and delivery by Debtors and Guarantors) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Lender enforceable against Lender in accordance with their respective terms.

**7.2**    **No Conflicts; Consents**. The execution, delivery, and performance by Lender of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of formation, limited liability company agreement, or other organizational documents of Lender; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Lender. No consent, approval, waiver, or authorization is required to be obtained by

Lender from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Lender of this Agreement and the consummation of the transactions contemplated hereby.

**7.3    Legal Proceedings**. There is no Action of any nature pending or, to Lender's knowledge, threatened against or by Lender that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**7.4    Brokers**. No broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Lender.

## ARTICLE 8
## COVENANTS

**8.1    Employees**. On or promptly following the Closing Date, Lender will offer "at will" employment to a material portion of the employees of Debtors.

**8.2    Public Announcements**. Unless otherwise required by applicable law, no Debtor shall make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of Lender.

**8.3    Transfer Taxes**.  All transfer, documentary, sales, use, stamp, registration, value added, and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne and paid by Lender when due. Lender shall, at its own expense, timely file any Tax Return or other document with respect to such taxes or fees (and Debtors shall cooperate with respect thereto as necessary).

**8.4    Confidentiality**. From and after the Closing, Debtors shall, and shall cause their Affiliates to, hold, and shall cause their respective Representatives to hold, in confidence, any and all information, whether written or oral, concerning the Business, except to the extent that such Debtor can show that such information (a) is generally available to and known by the public through no fault of any Debtor, any of their Affiliates, or their respective Representatives; or (b) is lawfully acquired by a Debtor, as applicable, any of its Affiliates or its Representatives from and after the Closing from sources that are not prohibited from disclosing such information by a legal, contractual, or fiduciary obligation. If any Debtor or any of their Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, such Debtor, as applicable, shall promptly notify Lender in writing and shall disclose only that portion of such information that such Debtor is advised by its counsel in writing is legally required to be disclosed, provided that such Debtor shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**8.5    Bulk Sales Laws**. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Assets to Lender.

**8.6** **Receivables**. From and after the Closing, if any Debtor or any of their Affiliates receives or collects any items or funds relating to any Accounts Receivable or any other Asset, such Debtor or its Affiliate shall hold such items or funds in trust for the Lender and shall remit such items or funds to Lender immediately upon its receipt thereof, in the form received.

**8.7** **Further Assurances**. Following the Closing, each of the Parties shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder. Each Debtor hereby appoints Lender as such Debtor's lawful attorney-in-fact to execute such documents and take such actions in such Debtor's name as may be reasonably necessary to give effect to this Agreement, including the right to indorse and deposit to Lender's account all instruments evidencing payments that are included in the Assets. This power of attorney is coupled with an interest and is irrevocable.

**ARTICLE 9**
**OTHER AGREEMENTS**

**9.1** **Tax Refunds and Workers Compensation Bond**. Debtors shall use commercially reasonable efforts to cause the preparation and timely filing of federal income Tax Returns (or amended Tax Returns) for their 2019 tax year and, when due, for its 2020 tax year. Debtors acknowledge that Man in the Arena is due a federal income tax refund and that such refund and any other tax refund due to any Debtor is subject to Lender's security interest and is included in the Assets. Debtors shall execute such documents as Lender may reasonably require to evidence the assignment of such tax refunds to Lender and to arrange the direct payment thereof to Lender. Debtors shall execute such documents as Lender may reasonably require to evidence the assignment of any interest in unused proceeds of a workers compensation bond deposited with the State of Illinois and to arrange for the direct payment thereof to Lender.

**9.2** **Release of Lender Parties**. In consideration of Lender's execution of this Agreement, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, each Debtor and Pledgor hereby fully and unconditionally releases and forever discharges the Lender Parties of and from any and all Claims that it may have against any Lender Party arising from or related to the Credit Agreement, the Loan Documents, or the Term Loan as of the time of the execution of this Agreement. Each Debtor and Pledgor further severally agrees that it shall forever refrain and forbear from commencing, instituting, or prosecuting any lawsuit, action, or other proceeding, whether judicial, administrative, or otherwise, or otherwise attempting to collect or enforce, any such released Claim and severally agrees to indemnify, defend (with counsel reasonably satisfactory to Lender), and hold harmless the Lender Parties against any and all loss, liability, claim, or expense, including attorneys' fees, that any of them might incur as a result of any breach of this release by it or the assertion of any released Claim or defense that exists as of the date of execution of this Agreement by in the case of any Debtor or Pledgor or any Debtor Party. Each Debtor and Pledgor further waives any presently existing defenses against the payment and performance of all obligations (of every nature, character, and description) to the Lender Parties and Pledgors under the Loan Documents. Notwithstanding the foregoing, Lender's obligations under and with respect to the execution and delivery of this Agreement and the Ancillary Documents are not released.

**9.3     Release of Debtor Parties and Pledgors**.  In consideration of the execution of this Agreement by Debtors and Pledgors, and for other valuable consideration, the receipt and sufficiency of which are acknowledged, Lender hereby fully and unconditionally releases and forever discharges the Debtor Parties and Pledgors of and from any and all Claims that the Lender Parties may have against any Debtor Party or Pledgor arising from or related to the Credit Agreement, the Loan Documents, or the Term Loan as of the time of the execution of this Agreement; provided, however, that the foregoing shall not operate to release or discharge any Claims arising from willful misconduct, actual fraud, or gross negligence of any such any Debtor Party or Pledgor as determined by a final order of a court of competent jurisdiction. Lender further agrees that it shall forever refrain and forbear from commencing, instituting, or prosecuting any lawsuit, action, or other proceeding, whether judicial, administrative, or otherwise, or otherwise attempting to collect or enforce, any such released Claim and agrees to indemnify, defend (with counsel reasonably satisfactory to the relevant Debtor Party or Pledgor), and hold harmless the Debtor Parties and Pledgors against any and all loss, liability, claim, or expense, including attorneys' fees, that any of them might incur as a result of any breach of this release by Lender or the assertion of any released Claim or defense that exists as of the date of execution of this Agreement by Lender or any Lender Party. Notwithstanding the foregoing: (i) the Debtors' and Pledgors' obligations under and with respect to the execution and delivery of this Agreement and the Ancillary Documents are not released, (ii) the Debtors' and Pledgors' obligations under and with respect to the Loan Documents (including the security provided for therein) are not released as to the Deficiency or as to any obligations of indemnity or other obligations that may arise thereunder after the Closing Date, (iii) this <u>Section 9.3</u> shall be ineffective *ab initio* as to any Person not a Party who asserts against any Lender Party any Claim that would have been released if such Person had joined as a releasing party under <u>Section 9.2</u>, and (iv) to avoid doubt, the contractual obligations of subordination provided in the Riddell Intercreditor Agreement remain in full effect.

## ARTICLE 10
## MISCELLANEOUS

**10.1     Survival**. The representations and warranties contained herein or in any Ancillary Document or certificate delivered pursuant to this Agreement or the Ancillary Documents shall survive the Closing.

**10.2     Expenses**. Except as otherwise specifically provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses.

**10.3     Notices**. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 10.3</u>):

If to Borrowers:         Kranos Holding Corporation
710 South Industrial Drive
Litchfield, Illinois 62056
Attention: Barb Crispens
E-mail: bcrispens@schutt-sports.com

with a copy to (which
shall not constitute
notice):         McDonald Hopkins
300 North LaSalle Drive, Suite 1400
Chicago, Illinois 60654
Attention: Marc J. Carmel
        Jeff Van Winkle
E-mail: mcarmel@mcdonaldhopkins.com
        jvanwinkle@mcdonaldhopkins.com

If to Guarantors:         Kranos Holding Corporation
710 South Industrial Drive
Litchfield, Illinois 62056
Attention: Barb Crispens
E-mail: bcrispens@schutt-sports.com

with a copy to (which
shall not constitute
notice):         McDonald Hopkins
300 North LaSalle Drive, Suite 1400
Chicago, Illinois 60654
Attention: Marc J. Carmel
        Jeff Van Winkle
E-mail: mcarmel@mcdonaldhopkins.com
        jvanwinkle@mcdonaldhopkins.com

If to James A. Stutts, Jr.:
568 Rockport Court
Encinitas, California  92024
Attention: James A. Stutts, Jr.
E-mail: jimstutts2@gmail.com

with a copy to (which
shall not constitute
notice):         McDonald Hopkins
300 North LaSalle Drive, Suite 1400
Chicago, Illinois 60654
Attention: Marc J. Carmel
        Jeff Van Winkle
E-mail: mcarmel@mcdonaldhopkins.com

jvanwinkle@mcdonaldhopkins.com

If to Robert W. Erb, Jr.:

        761 Plandome Road
        Manhasset, New York 11030
        Attention: Robert W. Erb, Jr.
        E-mail: rwerbjr@gmail.com

with a copy to (which
shall not constitute
notice):        McDonald Hopkins
        300 North LaSalle Drive, Suite 1400
        Chicago, Illinois 60654
        Attention: Marc J. Carmel
                Jeff Van Winkle
        E-mail: mcarmel@mcdonaldhopkins.com
                jvanwinkle@mcdonaldhopkins.com

If to Lender:        Schutt AcquisitionCo, LLC
        c/o Innovatus Capital Partners
        777 Third Avenue, 25th Floor
        New York, New York 10017
        Attention: Andrew Hobson
        E-mail: ahobson@innovatuscp.com

with a copy to:        Bradley Arant Boult Cummings LLP
        1600 Division Street
        Suite 700
        Nashville, Tennessee  37203
        Attention: Roger G. Jones
        E-mail: rjones@bradley.com

**10.4    Headings**. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**10.5    Severability**. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**10.6    Entire Agreement**. This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the documents to be delivered hereunder, the Exhibits and Disclosure Schedules (other than an exception expressly set

forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**10.7    Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns; provided, however, that no Debtor may assign its rights or delegate its obligations hereunder without the prior written consent of Lender.

**10.8    No Third-Party Beneficiaries**. Except as provided in the releases set forth herein and as to Lender's Designees, which shall be deemed beneficiaries hereof along with Lender as to the Assets they acquire, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**10.9    Amendment and Modification**. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party.

**10.10    Waiver**. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**10.11    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.** Section 13.2 of the Credit Agreement is incorporated by this reference as though set forth in full in this Section.

**10.12    Specific Performance**. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**10.13    Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

This Partial Strict Foreclosure Agreement is executed as of the date first written above.

**BORROWERS:**

**KRANOS CORPORATION**
**KRANOS RE CORPORATION**
**KRANOS IP CORPORATION**
**KRANOS IP II CORPORATION**
**KRANOS IP III CORPORATION**
**KRANOS DIAMOND SPORTS, INC.**
**FIELD TO FIELD, INC.**

By: _____

    Name:  Robert W. Erb, Jr.

    Title: Chief Executive Officer

**GUARANTORS:**

**MAN IN THE ARENA, INC.**
**KRANOS HOLDING CORPORATION**
**KRANOS INTERMEDIATE HOLDING**
**CORPORATION**
**KRANOS ACQUISITION CORPORATION**

By: _____

    Name:  Robert W. Erb, Jr.

    Title: Chief Executive Officer

**PLEDGORS:**

_____
ROBERT W. ERB, JR.

_____
JAMES A. STUTTS, JR.

DocuSign Envelope ID: 7C2C938C-3387-458A-9B97-78B1F9D7ADA

This Partial Strict Foreclosure Agreement is executed as of the date first written above.

**BORROWERS:**

**KRANOS CORPORATION**
**KRANOS RE CORPORATION**
**KRANOS IP CORPORATION**
**KRANOS IP II CORPORATION**
**KRANOS IP III CORPORATION**
**KRANOS DIAMOND SPORTS, INC.**
**FIELD TO FIELD, INC.**

By: _____
       Name:  Robert W. Erb, Jr.
       Title: Chief Executive Officer

**GUARANTORS:**

**MAN IN THE ARENA, INC.**
**KRANOS HOLDING CORPORATION**
**KRANOS INTERMEDIATE HOLDING**
**CORPORATION**
**KRANOS ACQUISITION CORPORATION**

By: _____
       Name:  Robert W. Erb, Jr.
       Title: Chief Executive Officer

**PLEDGORS:**

_____
ROBERT W. ERB, JR.

_____
1F80C7F3FEDB470...
JAMES A. STUTTS, JR.

This Partial Strict Foreclosure Agreement is executed as of the date first written above.

**SCHUTT ACQUISITIONCO, LLC,**
as Agent and Lender

By:_____

Name: Andrew Hobson

Title: President